## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| TANGI STANFORD, | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| v. | ] | **1:17-cv-00951-ACA** |
| | ] | |
| HONDA MANUFACTURING OF | ] | |
| ALABAMA LLC, | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendant Honda Manufacturing of Alabama LLC's ("Honda" or "HMA") motion for summary judgment. (Doc. 27).

In this case, Plaintiff Tangi Stanford asserts that her employer, Honda, violated her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"); the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008; and the Family and Medical Leave Act ("FMLA"). The court **WILL GRANT** Honda's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of Honda and against Ms. Stanford. The court concludes that Ms. Stanford failed to administratively exhaust her hostile work environment claim and parts of her sex and disability discrimination claims because she did not file a timely charge of discrimination raising those claims with the Equal Employment Opportunity Commission. As to the claims that she did

administratively exhaust, Honda proffered evidence that it terminated her because of her poor evaluations two years in a row and failure to improve her performance, and Ms. Stanford failed to create a genuine issue of material fact about whether those reasons for her termination were pretextual.

## I.    BACKGROUND

In deciding a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

Ms. Stanford worked for Honda from 2005 until her employment was terminated on April 13, 2016.  (Doc. 29-1 at 33, 109; Doc. 29-5 at 35).  When she began working for Honda, she received Honda's Associate Handbook, which includes a "Mutual Respect Policy."  (Doc. 29-1 at 33, Doc. 29-2 at 2, 13).  The Mutual Respect Policy explains that Honda prohibits harassment relating to, among other things, a person's sex or disability and provides a process for reporting any harassment.  (Doc. 29-2 at 13).

In 2012, Ms. Stanford became a Business Specialist in Honda's Staffing and Development Department, a position she remained in until her termination on April 13, 2016.  (Doc. 28 at 7; Doc. 29-5 at 35; Doc. 29-15 at 2; Doc. 33 at 4).  As a Business Specialist, her responsibilities included "evaluating training needs at

HMA, creating third-party vendor training budgets, serving as a liaison between training vendors and HMA, and scheduling and conducting training classes for HMA associates." (Doc. 28 at 7; Doc. 33 at 4). When Ms. Stanford began working as a Business Specialist, her Team Manager was Dave Howell, but Warren Burbank became her Team Manager in October 2015. (Doc. 28 at 7; Doc. 29-8 at 5; Doc. 29-13 at 5; Doc. 33 at 4).

Ms. Stanford alleges that Honda "maintained a 'good old boys club' atmosphere." (Doc. 33 at 9; Doc. 37 at 1). She testified that the male employees would go on breaks together, take weekend trips, "do things after work," banter and use nicknames like Buddy and Champ for each other, and conduct "training-related activities" and "community relations activities" that the women were not invited to attend. (Doc. 29-1 at 67–69, 91). When asked how any of these actions affected her work, she responded that "a lot of times, they would make decisions at break or lunch of things that were going to happen. They would come back from break and lunch and a meeting had been set up, or something had changed, and so then I had to rearrange my schedule so that I could go to that or do that." (*Id.* at 91).

Ms. Stanford testified that her male co-workers, including her then-Team Manager Mr. Howell, would joke about women being on their periods, making comments like, "Are you girls ragging?" or "Is it your time of the month?" (*Id.* at

92).  On one occasion, during a meeting with Mr. Howell and a male coworker, the male coworker refused to speak to Ms. Stanford directly and, when she spoke to him, said, "What do you know?  You're a girl."  (*Id.* at 70).  After the meeting, when Ms. Stanford asked Mr. Howell why he did not defend her during the meeting, he told her: "That's just the way it is down here," and "That's the way people think."  (*Id.* at 70–71).  On another occasion, Ms. Stanford was counseled based on a complaint made by an unidentified coworker against her, and her then-manager said "it was like two dogs, sometimes they just don't get along."  (*Id.* at 36).

Ms. Stanford also alleged that she had repeated problems with another Honda associate, Doug East, with whom she worked in 2013.  (*See* Doc. 29-1 at 57).  On one occasion as she and Mr. East were waiting for another employee to join them, he got between her and the door and asked her out for a drink.  (*Id.* at 55–56).  She never reported this incident to anyone at Honda because she did not want to "ruffle any feathers" and she did not believe anyone would take it seriously.  (*Id.* at 56).  On another occasion, Mr. East was driving her to a training center when he "brought up something about liking to fuck or him fucking" and asked her "So you don't like to fuck?"  (*Id.* at 59).  As with the first incident, Ms. Stanford did not report this conversation to anyone at Honda.  (*Id.*).

In addition to their in-person conversations, Ms. Stanford and Mr. East also texted extensively throughout 2013.  (*See* Docs. 29-3, 29-4).  For example, in May 2013, they exchanged the following texts:

May 24, 2013, 1:56 PM

| | |
|---|---|
| Mr. East: | So where did you eat lunch? |

May 24, 2013, 2:34 PM

| | |
|---|---|
| Mr. East: | I ate in cafe.  Didnt get invite to dine with you. |
| Mr. East: | I think I would like having a drink with you even better! ;) |

May 24, 2013, 2:53 PM

| | |
|---|---|
| Ms. Stanford: | Lol.. I was waiting on an invite from u.. I haven't even been to lunch yet.. |
| Ms. Stanford: | too bad we can't do drinks for lunch ;) |
| Mr. East: | We can if we take lunch at 4:00! :) |
| Mr. East: | At your computer? |
| Ms. Stanford: | Lol no but I will be in a bit if I need to.. why? |
| Mr. East: | IM ME |

May 24, 2013, 3:19 PM

| | |
|---|---|
| Ms. Stanford: | I'm not at my desk |
| Ms. Stanford: | Or in front of my pc lol |
| Mr. East: | Somewhere around here has a bottle of capt morgan I hope! |
| Mr. East: | so what are you doing?  Not working obviously!  Lol |

May 24, 2013, 5:15 PM

| | |
|---|---|
| Ms. Stanford: | Lol.. I was working.. working very hard at not being found to have to do more work.. lol ;) |

May 24, 2013, 7:28 PM

Mr. East:          Show me how to do that!

May 25, 2013, 8:25 AM

Ms. Stanford:     Lol I learned it from u ;)

May 25, 2013, 9:10 AM

Mr. East:          I'm a good teacher!

(Doc. 29-3 at 1–5).

On October 29, 2013, Mr. East texted Ms. Stanford: "You never drink during the week after work? :-)" (*Id.* at 6). She did not respond. (*Id.*). On November 19, 2013, Mr. East and Ms. Stanford texted about having lunch, and then on November 27, 2013, Mr. East texted: "Drive safe girl, up to the frozen north. You know if you were a turkey I'd :-) (insert your own devious idea here)." (*Id.* at 6–7). Ms. Stanford did not respond to that text either. (*Id.* at 7).

From April until August 2014, Mr. East and Ms. Stanford texted purely about work. (*Id.* at 7–19). Then, on August 12, 2014, they had the following exchange:

August 12, 2014, 10:07 AM

Mr. East:          Call me

August 12, 2014, 11:55 AM

Ms. Stanford:     Sorry.. I'm not at work today.. home in bed..
Mr. East:          With who?

Ms. Stanford:  Lol nobody
Mr. East:   Too bad!

(*Id.* at 19–20).  The next day, Ms. Stanford texted Mr. East: "Can u still meet today silly one?"  (*Id.* at 20).  The remaining texts submitted to the court relate only to work issues.  (*Id.* at 20–31).

Finally, Ms. Stanford's phone records show 41 phone calls between her and Mr. East, of which she initiated 31.  (Doc. 29-4).  Ms. Stanford testified that she frequently called Mr. East about work, and never called him for personal business. (Doc. 29-1 at 64).

In January or February of 2014, she showed Mr. Howell, her Team Manager, the text messages Mr. East had sent her "because [she] wasn't comfortable working with Doug in a closed-room environment anymore."  (Doc. 29-1 at 54, 70; *see also* Doc. 29-3 at 6–7).  Mr. Howell responded: "Are you refusing to do your job?"  (*Id.* at 56, 66).  When she said no, "he got up, looked at [her], and walked out."  (*Id.* at 70).  Ms. Stanford did not testify that she complained to anyone else about Mr. East.  In addition, Honda's Department Manager of Human Resources, Robb Harris, attested that Ms. Stanford never reported to him any concerns about Mr. East.  (Doc. 29-10 at 11).  He further attested that to the best of his knowledge, she had not used the process set out in the Associate Handbook to complain about Mr. East.  (*Id.*).

In March 2014, Ms. Stanford received a poor rating on an annual evaluation. Honda uses a Performance Plan and Review process for its associates. (Doc. 29-14 at 4). Under that plan, the associate and the management team set goals for each evaluation period. (*Id.*). The associate's supervisor conducts a mid-year check and a year-end check. (*Id.*). The final report rates the associate's performance for each goal as "Outstanding," "Exceeds Expectations," "Meets Expectations," "Below Expectations," or "Unacceptable." (*Id.* at 5). The report also rates the associate's overall performance using the same terms. (*Id.*).

If an associate's final report gives an overall rating of "Below Expectations," the supervisor may require a performance improvement plan. (Doc. 29-12 at 7). If the associate receives a second final report with a "Below Expectations" rating, the associate is automatically placed on a performance improvement plan. (*Id.*). The performance improvement plan is designed to be a 90-day review with the associate meeting with her supervisor every 30 days to evaluate her progress. (*Id.*). At the end of the 90-day review, the associate's manager can terminate or demote the associate or, if she has "shown improvement but is still not meeting expectations," the manager can extend the plan. (*Id.* at 7–8).

Ms. Stanford's overall rating for the period April 1, 2013 to March 31, 2014 was "Below Expectations." (Doc. 28 at 9; Doc. 33 at 4). Ms. Stanford received a second consecutive overall rating of "Below Expectations" for the period of April

1, 2014 to March 31, 2015, (Doc. 28 at 9; Doc. 33 at 5). On July 23, 2015, she was placed on a performance improvement plan for three goals: proactive planning, ownership, and visibility. (Doc. 29-1 at 53; Doc. 29-2 at 71). Ms. Stanford met with her Team Manager at the 30-day, 60-day, and 90-day intervals. (Doc. 29-1 at 74; Doc. 29-2 at 72–75). At the 30-day evaluation, Ms. Stanford's then-Team Manager—Mr. Howell—marked her progress for proactive planning as unsatisfactory; for ownership as satisfactory; and for visibility as unsatisfactory. (Doc. 29-2 at 72–74).

In August 2015, Ms. Stanford reported to an attorney in Honda's Legal Department that Mr. Howell had created a hostile work environment and had mismanaged invoices. (Doc. 29-1 at 75–76). Honda referred the hostile work environment complaint to outside counsel, who identified two specific allegations relating to a hostile work environment: (1) in 2007, Mr. Howell grabbed Ms. Stanford's arm and yelled at her, and (2) in 2009, Mr. Howell shook his finger in her face while discussing her performance. (Doc. 29-10 at 9 at 9–10; *see also* Doc. 29-1 at 76). Because Ms. Stanford made her complaint in 2015, Honda "could not substantiate Ms. Stanford's report of a hostile work environment." (Doc. 29-10 at 10). Ms. Stanford concedes that Mr. Howell did not harass or mistreat her based on her sex after she made her 2015 report to Honda. (Doc. 29-1 at 78).

Meanwhile, Ms. Stanford was still on her performance improvement plan. In between the 60-day evaluation and the 90-day evaluation, her Team Manager changed from Mr. Howell to Mr. Burbank. (Doc. 29-1 at 75; Doc. 29-8 at 6). At her 60-day and 90-day evaluations, Mr. Burbank marked her progress for all three goals as satisfactory. (Doc. 29-2 at 72–74). Mr. Burbank attested that by the end of the 90-day period, he and the Department Manager, Matt Watkins, had determined that she was not going to complete some of the goals that had been set for her and that Mr. Burbank had not had enough time to properly evaluate her progress. (Doc. 29-8 at 6–7). As a result, they "decided to give Ms. Stanford a progress rating of satisfactory for the 90-day review period and to extend Ms. Stanford's [performance improvement plan] review period to . . . March 31, 2016." (*Id.* at 7).

Although Mr. Burbank attested that he informed Ms. Stanford of the extension of her performance improvement plan, she testified that by the end of the 90-day period, she believed she had successfully completed her performance improvement plan. (Doc. 29-2 at 75; Doc. 29-8 at 7). Given the standard on summary judgment, the court will accept Ms. Stanford's testimony that she did not realize her performance improvement plan had been extended. Nevertheless, Ms. Stanford also testified that she "knew [she] still had work [she] had to do" to meet the goals set out in her performance improvement plan. (Doc. 29-1 at 83).

On February 16, 2016, Mr. Burbank met with Ms. Stanford to discuss the fact that she was not meeting those goals. (Doc. 29-8 at 7; *see also* Doc. 29-1 at 75, 79). Although Ms. Stanford testified that she does not recall this February 2016 meeting, she admits that "in February there were some issues with [her] work." (Doc. 29-1 at 80).

In March 2016, Ms. Stanford requested FMLA leave to have a laparoscopic sleeve and hiatal hernia surgery. (Doc. 29-1 at 86; Doc. 28 at 17; Doc. 33 at 9). Honda's leave administrator approved the request and her leave was scheduled to begin on April 19, 2016. (Doc. 29-10 at 11). Ms. Stanford had a history of health issues necessitating intermittent FMLA leave. Between 2008 and when she was fired in 2016, Ms. Stanford requested and took FMLA leave on 24 occasions for surgeries to remove cysts, gastric polyps, complications from gallbladder surgery, migraines and headaches, and kidney stones. (Doc. 29-1 at 85; *see* Doc. 29-5 at 10–12). She also testified that within two years of her firing, she was in a team meeting with a senior vice president named Mike Oakridge, who said Honda "was looking at studies on what they could do to crack down on . . . people being allowed to take intermittent FMLA." (Doc. 29-1 at 85).

On March 31, 2016, Mr. Burbank and Mr. Watkins determined that Ms. Stanford's work had not shown satisfactory improvement. (Doc. 28 at 11; Doc. 33 at 6). Her employment was terminated on April 13, 2016. (Doc. 29-5 at

35).  Because Honda fired her on April 13, 2016, she never took her FMLA leave scheduled to begin six days later, on April 19, 2016.

As of her deposition, Ms. Stanford has been unsuccessful in finding a new job.  (Doc. 29-1 at 15).  She testified that she believes Honda has given negative references to prospective employers, but concedes that she has no evidence of any poor references.  (Doc. 28 at 16; Doc. 33 at 8).

On October 11, 2016, Ms. Stanford filed an EEOC charge of discrimination against Honda, alleging sex, age, and disability discrimination, as well as retaliation.  (Doc. 29-5 at 35).  She stated that she "was denied promotion, had [her] job security threatened, had [her] work performance misrepresented and disrupted, given additional assignments and greater workload than my male counterparts, had credit denied [her] for job performance, harassed, and was ultimately terminated."  (*Id.*).  The EEOC issued Ms. Stanford a notice of right to sue.  (*Id.* at 36).

In her amended complaint, Ms. Stanford raised the following claims: (1) sex-based discrimination, in violation of Title VII; (2) retaliation, in violation of Title VII; (3) violation of the FMLA; and (4) disability-based discrimination, in violation of the ADA, as amended by the ADA Amendments Act of 2008.  (Doc. 15).

## II.    DISCUSSION

Honda moves for summary judgment on various grounds, including failure to administratively exhaust certain claims and failure to present evidence creating a genuine dispute of material fact that it discriminated against Ms. Stanford, retaliated against her, or violated her rights under the FMLA. (Doc. 28 at 20–37).

In deciding a motion for summary judgment, the court must first determine if the parties genuinely dispute any material facts, and if they do not, whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Under Rule 56, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted). A disputed fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

1.    Failure to Exhaust Administrative Remedies

Honda asserts that Ms. Stanford failed to exhaust her administrative remedies for her hostile work environment claim and some of her sex, disability, and retaliation claims, because her EEOC charge of discrimination was not timely filed as to those claims. (Doc. 28 at 20–22). Ms. Stanford does not respond to the

timeliness argument, contending instead that her EEOC charge adequately alleged a hostile work environment, sex and disability discrimination, and retaliation. (Doc. 33 at 11–12).

A plaintiff seeking to file a claim under Title VII must first exhaust her administrative remedies, beginning by filing a timely charge of discrimination with the EEOC. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001); *see* 42 U.S.C. § 2000e-5(e)(1). In a state like Alabama, which does not have an EEOC-like administrative agency, the plaintiff must file her EEOC charge within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178 & n.13 (11th Cir. 2005), *superseded in part on other grounds by statute*, Pub. L. No. 111-2, § 3.

Ms. Stanford filed her EEOC charge on October 11, 2016, meaning that any claims arising from an "employment practice" that "occurred" before April 14, 2016 are time-barred. (Doc. 29-5 at 35). For a hostile work environment claim, "the employee need only file a charge within 180 . . . days of any act that is part of the hostile work environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002). But "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire . . . constitute[ ] . . . separate actionable 'unlawful employment practice[s]," and as a result, "only incidents that took place

within the timely filing period are actionable." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002), *superseded in part on other grounds by statute*, Pub. L. No. 111-2, § 3.

Ms. Stanford's hostile work environment claim is timely so long as "any act that is part of the hostile work environment" occurred on or after April 14, 2016. *See* 42 U.S.C. § 2000e-5(e)(1). Ms. Stanford has not identified any such act. Her hostile work environment claim stems from Mr. Howell's and Mr. East's treatment of her, but she admits that Mr. Howell had not harassed or mistreated her after she complained about him in 2015, and all of her allegations about Mr. East related to the period in 2013 when they worked together. (Doc. 29-1 at 55–59, 78; Docs. 29-3, 29-4). Thus, none of the "act[s] that [are] part of the hostile work environment" occurred within the 180 days before she filed her EEOC charge, and she has failed to administratively exhaust her hostile work environment claim. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 118.

Ms. Stanford's other claims of sex and disability discrimination and retaliation are also timely only if the challenged action occurred after April 14, 2016. Ms. Stanford claims that Honda discriminated and retaliated against her by giving her a "Below Expectations" performance review in 2014 and 2015 and by placing her on a performance improvement plan in 2015. To the extent Ms. Stanford intended to raise freestanding claims of discrimination and retaliation

based on her 2014 and 2015 performance reviews or based on the decision to put her on a performance improvement plan in 2015, she has failed to timely exhaust those claims because they "occurred" long before April 14, 2016.

Finally, Honda argues that Ms. Stanford failed to exhaust any claim of retaliation based on Honda giving negative references to potential employers because her EEOC charge of discrimination does not mention any references. (Doc. 28 at 21–22). Again, the court agrees. Ms. Stanford's EEOC charge made no mention of any negative references. And even if her allegation relates to alleged negative references given after she filed her EEOC charge, she did not amend that charge or file a new one to raise her suspicion before the EEOC; nor would negative references have been within the scope of the EEOC's investigation into what she did allege in her charge. *See Batson v. Salvation Army*, 897 F.3d 1320, 1327 (11th Cir. 2018) ("[The Eleventh Circuit] . . . has noted that judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate.") (alteration in original). Accordingly, she did not administratively exhaust any claim of retaliation by giving negative references.

The court **WILL GRANT** Honda's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of Honda on Ms. Stanford's claim of a hostile work environment and her claims that Honda discriminated or

retaliated against her by giving her negative performance reviews in 2014 and 2015, putting her on a performance improvement plan, or giving negative references to prospective employers.

2.     Remaining Claims

Ms. Stanford asserts that Honda's termination of her employment constitutes sex discrimination and retaliation, in violation of Title VII; disability discrimination, in violation of the ADA; FMLA interference; and FMLA retaliation.  Honda seeks summary judgment as to the merits of each of those claims.  (Doc. 28 at 22–30, 34–37).

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and from "discriminat[ing] against any individual . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter," *id.* § 2000e-3(a).  The ADA prohibits "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a).

The FMLA permits "an eligible employee" to take "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under this subchapter," *id.* § 2615(a)(1), and from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter," *id.* § 2615(a)(2).

For most of her claims—sex discrimination and retaliation, disability discrimination, and FMLA retaliation, but not FMLA interference—in the absence of direct evidence supporting the claim, the court "use[s] the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981)." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (Title VII) (citations shortened); *Strickland v. Water Works & Sewer Bd. of City of Birmingham,* 239 F.3d 1199, 1207 (11th Cir. 2001) (FMLA retaliation); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1333 (11th Cir. 1999) (ADA).

Under the *McDonnell Douglas* test, the plaintiff must first establish a *prima facie* case of discrimination or retaliation, creating a rebuttable presumption that the employer acted unlawfully. *Wilson*, 376 F.3d at 1087; *Farley*, 197 F.3d at

1336.  In this case, the court will assume that Ms. Stanford has established a *prima facie* case of discrimination or retaliation.  Once a plaintiff has done that, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its actions."  *Wilson*, 376 F.3d at 1087; *Farley*, 197 F.3d at 1336.  If the employer can satisfy its burden, then the plaintiff must offer evidence that the reason proffered was a pretext for discrimination or retaliation.  *Wilson*, 376 F.3d at 1087; *Farley*, 197 F.3d at 1336.  To establish that a reason was pretextual, the plaintiff must present evidence that "the reason was false, and that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007).

### A.    Sex and Disability Discrimination Claims

Honda contends that Ms. Stanford failed to establish a genuine dispute about whether Honda's legitimate, non-discriminatory reasons for terminating her were pretextual.  (Doc. 28 at 22–26).

As stated above, the court will assume that Ms. Stanford has established a *prima facie* case of sex and disability discrimination, shifting the burden to Honda to articulate a legitimate, non-discriminatory reason for her termination.  *Wilson*, 376 F.3d at 1087.  Honda met its burden by submitting evidence of Ms. Stanford's two consecutive "Below Expectations" performance reviews in 2014 and 2015,

followed by her failure to satisfactorily complete her performance improvement plan. (Doc. 28 at 9; Doc. 33 at 4–5). The burden therefore shifts back to Ms. Stanford to offer "evidence that the alleged reason of the employer is a pretext for illegal discrimination." *Wilson*, 376 F.3d at 1087.

Ms. Stanford argues that Honda's articulated reasons were pretext for sex discrimination because a genuine dispute exists about whether she completed her performance improvement plan. (Doc. 33 at 14). The evidence shows that in the last two thirty-day periods of her performance improvement plan, she received satisfactory ratings on all of her goals, and, taken in the light most favorable to Ms. Stanford, no one ever told her the performance plan had been extended, so she believed she had completed it satisfactorily. (Doc. 29-2 at 72–75). But she concedes that, in February 2016, she understood that "there were some issues with [her] work" because her Team Manager, Mr. Burbank, met with her to discuss those issues. (Doc. 29-1 at 75, 79, 80).

In addition, Mr. Burbank and Mr. Watkins attested that by March 2016, they had determined that Ms. Stanford's work had not improved enough, prompting their decision to terminate her employment. (Doc. 28 at 11; Doc. 29-8 at 8; Doc. 29-14 at 9; Doc. 33 at 6). Ms. Stanford has presented no evidence to dispute Mr. Burbank and Mr. Watkins' testimony; and she conceded in her deposition that

Mr. Burbank and Mr. Watkins did nothing to discriminate against her. (Doc. 29-1 at 65).

Ms. Stanford has not met her burden of presenting evidence showing that the proffered reasons for her termination were false. *See Springer*, 509 F.3d at 1349. And evidence of minor abnormalities within Honda's internal performance review process will not suffice to create a genuine dispute of material fact about the falsity of the proffered reason or the existence of discriminatory animus. *Cf. id.* at 1348–49 ("Plaintiff may demonstrate that [the employer's] reasons were pretextual by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employers'] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.") (quotation marks omitted); *see also Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. [The courts] are not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'").

Ms. Stanford next argues that a genuine dispute exists about whether Honda's proffered legitimate, non-discriminatory reasons for her termination were pretext for disability discrimination because of evidence that Honda was

attempting to "crack down" on employees' use of FMLA leave. (Doc. 33 at 16). But even so, for the same reasons discussed above, Ms. Stanford has not created a genuine dispute of material fact about whether Honda's proffered reasons for her termination were false.

Because Ms. Stanford has not satisfied her burden to present evidence creating a genuine dispute of material fact about whether Honda's reasons for terminating her employment were pretext for sex or disability discrimination, the court **WILL GRANT** summary judgment in favor of Honda on Ms. Stanford's sex and disability discrimination claims.

## B.     *Title VII Retaliation Claim*

Honda contends that summary judgment is warranted on Ms. Stanford's retaliation claim because she did not engage in any protected conduct and, in the alternative, even if she did engage in protected conduct, she has not established a causal link between the protected conduct and her termination. (Doc. 28 at 26–27). Because the court finds that Ms. Stanford has not presented evidence creating a genuine dispute of material fact about causation, it will not address whether Ms. Stanford's complaints about Mr. East's and Mr. Howell's conduct constituted protected conduct under Title VII.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .   This requires proof that the unlawful

retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). Even a three-month delay between the protected conduct and the allegedly retaliatory conduct is too long to meet the plaintiff's burden, unless the plaintiff can point to other evidence of causation. *Thomas*, 506 F.3d at 1364.

Ms. Stanford points to two complaints she made to Honda as protected activity: her January or February 2014 complaint about Mr. East's behavior and her August 2015 complaint about Mr. Howell's behavior. (Doc. 33 at 18–19; *see also* Doc. 29-1 at 54, 70, 75–76; Doc. 29-3 at 6–7). Even assuming those complaints were protected conduct, she was not terminated until April 2016, over two years after she complained about Mr. East and over seven months after she complained about Mr. Howell. Those periods of time are too remote to give rise to an inference that Honda terminated her in retaliation for complaining about her coworkers. *See Thomas*, 506 F.3d at 1364.

Accordingly, Ms. Stanford is required to present some other evidence of retaliation. She has not done so. And Honda has presented evidence that Ms. Stanford had "Below Expectations" performance reviews in 2014 and 2015 and that she failed to improve her performance after being placed on a performance improvement plan. (Doc. 28 at 11; Doc. 29-1 at 75, 79, 80; Doc. 29-8 at 8; Doc. 29-14 at 9; Doc. 33 at 6). Ms. Stanford's testimony that she believed Mr. Howell placed on her on the performance improvement plan in retaliation for her complaining about Mr. East is not enough to establish that her complaints were the but-for cause of her termination. *See Univ. of Texas Sw. Med. Ctr.*, 570 U.S. at 360. Honda's Performance Plan and Review process requires a supervisor to place an employee on a performance improvement plan if she receives a "Below Expectations" rating twice, and Ms. Stanford concedes that she met that criterion. (Doc. 29-12 at 7). Accordingly, the court **WILL GRANT** the motion for summary judgment in favor of Honda on Ms. Stanford's Title VII retaliation claim.

## C.     *FMLA Retaliation Claim*

Honda contends that the same legitimate, non-discriminatory reasons that precluded her sex and disability discrimination claims precludes her FMLA retaliation claim. (Doc. 28 at 36–38).

A plaintiff making a claim of FMLA retaliation must establish that (1) she engaged in protected activity; (2) she experienced an adverse employment action;

and (3) "there is a causal connection between the protected activity and the adverse action." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). Again, the court will assume that Ms. Stanford has established a *prima facie* case of FMLA retaliation. And again, the court notes that Honda has articulated legitimate, non-discriminatory reasons for her termination. Thus, the burden shifts back to Ms. Stanford to present evidence creating a genuine dispute of material fact about whether those legitimate, non-discriminatory reasons were pretextual.

Unlike Ms. Stanford's other claims, the fact that Honda fired her so close to her request for FMLA leave and the beginning of her scheduled leave might create a fact question about whether her termination was pretextual. *See Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."). Ms. Stanford requested FMLA leave in March 2016, was scheduled to begin her leave on April 19, 2016, and was fired on April 13, 2016. (Doc. 29-1 at 86; Doc. 28 at 17; Doc. 29-5 at 35; Doc. 29-10 at 11; Doc. 33 at 9). The decision to fire her was made within a few weeks of her request for leave and within six days of the scheduled

start of her leave, and could therefore suffice to create a genuine issue of material fact about causation.

But despite the temporal proximity, the evidence in the record requires the court to grant summary judgment to Honda on the claim of FMLA retaliation, because "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart*, 231 F.3d at 799. The decision makers behind Ms. Stanford's termination were Mr. Burbank and Mr. Watkins. (Doc. 28 at 11; Doc. 33 at 6). Ms. Stanford has presented no evidence indicating that either of them were aware of her request for leave or the fact that her leave request had been approved; to the contrary, Mr. Burbank and Mr. Watkins both attested that they were not aware she had been approved for an FMLA leave of absence to begin in April 2016. (Doc. 28-8 at 9; Doc. 2-14 at 10).

Because there is unrebutted evidence that the decision makers were unaware of Ms. Stanford's FMLA leave scheduled to begin in April 2016, she cannot establish causation. Accordingly, the court **WILL GRANT** summary judgment in Honda's favor on Ms. Stanford's FMLA retaliation claim.

### D.     *FMLA Interference Claim*

Honda asserts that Ms. Stanford has not presented any evidence supporting an FLMA interference claim because it would have terminated her regardless of her taking leave.  (Doc. 28 at 34–35).

"[T]he right to commence FMLA leave is not absolute, and . . . an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave."  *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010); *see also Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1170 (11th Cir. 2014) ("[W]hen an employee brings an FMLA interference claim alleging that the employer interfered with her FMLA rights by terminating her . . . , the employer can overcome a prima facie case of interference by showing that it terminated the employee for some reason not related to the requested medical leave.").

As discussed in the claims above, Honda has presented evidence that Ms. Stanford's termination was unrelated to her FMLA leave, and Ms. Stanford has not presented evidence that the reasons for her termination were false. Accordingly, the court **WILL GRANT** summary judgment in favor of Honda on Ms. Stanford's FMLA interference claim.

## III. CONCLUSION

The court **WILL GRANT** Honda's motion for summary judgment and

**WILL ENTER SUMMARY JUDGMENT** in favor of Honda and against

Ms. Stanford on all of her claims.

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this November 6, 2018.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE